**PAUL E. VOLPP TRACTOR PARTS, INC. d/b/a CEM Supply Company, Plaintiff,**

v.

**CATERPILLAR, INC., Defendant.**

No. 86–2871–TUA.

United States District Court, W.D. Tennessee, Western Division.

Aug. 3, 1995.

H. Kenneth Kudon, Washington, DC, for plaintiff.

Gregory I. Baker, Washington, DC, for defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TURNER, District Judge.

Plaintiff Paul E. Volpp Tractor Parts, Inc. ("Volpp") d/b/a CEM Supply Company ("CEM"), filed this action alleging federal and state antitrust violations as well as several state common law claims against defendant Caterpillar, Inc. ("Caterpillar"). Volpp subsequently filed an amended complaint. The essence of the claim is that Caterpillar entered into unlawful arrangements with authorized Caterpillar dealers in which Caterpillar conditioned the sale of its machines upon dealers' agreements to purchase genuine Caterpillar parts, to the near exclusion of parts offered for sale by CEM and other competitors. The specific claims alleged in the amended complaint are as follows:

(1) Action pursuant to Sections 4 and 15 of the Clayton Act, 15 U.S.C. §§ 15 & 26, for treble damages, injunctive relief, and costs, including reasonable attorneys' fees, for injuries suffered as a result of unlawful "tying" arrangements, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14;·

(2) Unlawful combination and conspiracy, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(3) Unlawful agreements made with a view to lessen full and free competition in importation of parts, in violation of *Tenn. Code Ann.* § 47–25–101; and

(4) Intentional interference with prospective business relations.

Caterpillar answered and counter-claimed, alleging false representation as to the quality and performance of its parts in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Both parties seek damages and injunctive relief.

Caterpillar filed a motion for summary judgment on each claim alleged by Volpp. On Volpp's tie-in claim (Count 1), Caterpillar argues: (a) that there is no evidence that it "tied" the sale of machines to the sale of replacement parts, (b) that there is no evi-

dence of coercion, (c) that there is no evidence of antitrust injury, and (d) that Volpp cannot show antitrust damages. On Volpp's conspiracy claim (Count 2), Caterpillar argues that the claim merely duplicates the tie-in claim and that there is no evidence of a conspiracy. On Volpp's Tennessee antitrust claim (Count 3), Caterpillar maintains that (a) Volpp may not seek damages under the Tennessee Antitrust Statute, (b) that there is no evidence of an unlawful combination, and (c) that Volpp cannot show an anticompetitive intent or effect. Finally, on Volpp's claim for interference with prospective business relations (Count 4), Caterpillar argues that Tennessee law does not recognize the tort and that the claim should accordingly be dismissed.

The parties have filed extensive memoranda and several volumes of exhibits in support of their respective filings. The court heard oral argument on the motion for summary judgment on June 1, 1994.

## I. FACTS

In considering the defendant's motion for summary judgment, the court will believe the evidence of the plaintiff and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *accord Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### 1. *Caterpillar, Inc.*

Caterpillar is engaged in the business of designing, manufacturing and marketing earth-moving, construction, agricultural and materials-handling equipment, engines and replacement parts. Caterpillar sells its products and services through a world-wide network of independent dealerships. Each dealership enters into a contractual "Sales and Service Agreement" with Caterpillar, a portion of which provides as follows:

### 2. Primary Purpose and [Caterpillar's] Reliance on Principals

(a) Both Dealer's and [Caterpillar's] primary purpose in entering into this agreement is to develop and promote the sale of products and to provide a high standard of parts availability and mechanical service to insure satisfaction by users of products. Within the service territory described in Exhibit A, Dealer shall be primarily responsible for fully and adequately developing and promoting the sale to customers and prospective customers located within such territory and for the servicing of all of the products specified in Exhibit A.

(b) [Caterpillar] and Dealer agree that Dealer's effectiveness and ability in achieving such purpose could be adversely affected by Dealer's affiliation with another organization which is a substantial operator of products. Dealer agrees that during the life of this agreement it will avoid any such affiliation whether by way of capital investment, source of capital, common management, common ownership, or otherwise, except to the extent that [Caterpillar] may otherwise agree in writing.[1]

The agreement may be terminated with or without cause on ninety days written notice.[2]

### 2. *Paul E. Volpp Tractor Parts, Inc.*

Volpp manufactures, assembles and distributes components and parts for off-road heavy construction, mining and logging equipment. These parts, commonly referred to as "non-genuine," "will-fit" or "gypo" are usually less expensive than genuine parts. Volpp distributes its products through two sales divisions, CEM and Heavy Equipment Parts. Through CEM, Volpp sells parts primarily to dealers for original equipment manufacturers ("OEMs"), including Caterpillar. The parts distributed by CEM for use in Caterpillar equipment include seals, gaskets and "O" rings. Volpp successfully cultivated several Caterpillar dealerships as its principal clients for its Caterpillar-compatible parts. According to Caterpillar, between

---

1. "Sales and Service Agreement" § 2, Ex. # 82 to Caterpillar Inc.'s Mem. in Supp. of its Mot. for Summ.J. ("Caterpillar's Motion") (Vol. III); Ex. # 1.15 to Pl.'s Statement of Material Facts in Dispute Responsive to Caterpillar's Mot. to [sic] Summ.J. ("Volpp's Response") (Vol. 1).

2. *Id.* § 29.

January 1982 and July 1986, over ninety percent of CEM's aggregate sales of Caterpillar-compatible parts were made to fifteen Caterpillar dealers.[3]

### 3. *Caterpillar's Goal To Regain Lost Parts Sales*

Following Caterpillar's first three years of losses in its history, the Caterpillar Product Support Department announced plans to move all programs that contribute to short term profitable sales to "top priority." [4] One such program was the sale of genuine Caterpillar parts to Caterpillar dealers.[5] All district managers, sales managers, and parts and service sales representatives were instructed to "do all those things that we know will work to sell parts." [6] Specifically, Caterpillar aggressively sought to recapture parts sales business which it lost to competitors when dealers sold "will-fit" parts instead of Caterpillar parts.[7]

**3.** Mem. in Supp. of Def.'s Mot. for Summ.J. at 10.

**4.** *See* Memo from MD Meadows to District Managers, Sales Representatives, and Parts and Service Sales Representatives (Oct. 12, 1984), Ex. # 3.4 to Volpp's Response (Vol. 1).

**5.** *Id.*

**6.** *Id.*

**7.** This effort actually had its origin prior to 1984. At a 1983 meeting of Caterpillar dealer principals, a Caterpillar representative gave the following statement:

> Before closing, there is one additional area I'd like to discuss. (Pause)
> No doubt due to the recessionary economy, some suppliers and numerous other companies have increased their efforts to secure a portion of your parts orders. Some Caterpillar dealers are utilizing, to varying degrees, these alternative sources.
> You may be thinking, "this doesn't apply to us." You might be surprised. Some well-intentioned employee may have found what appears to be a cheaper source for a few parts such as seals, hardware, electrical components, or friction material. This employee probably feels it's the same as Caterpillar supplies, but costs less. Perhaps your company is one of the Caterpillar dealers who has taken on a line of filters to supplement our line. You may find that in certain cases, the other line gets substituted for Caterpillar because "that's what the customer wants." These examples

### 4. *The "Pilot Exercises"*

Caterpillar developed a mathematical formula for the purpose of identifying dealers who were selling competitive parts.[8] Caterpillar then conducted a "pilot exercise" focused on three dealers: (1) Mustang Tractor & Equipment Co. in Houston, Texas; (2) Taylor Machinery Co. in Memphis, Tennessee; and (3) Pape' Brothers, Inc. in Eugene, Oregon.[9] This exercise confirmed the accuracy of Caterpillar's formula. Caterpillar "confronted" those dealers and sought to aggressively persuade them to purchase their parts almost exclusively from Caterpillar.[10] Eventually, these dealers were persuaded to source almost exclusively from Caterpillar.[11]

### 5. *Spreading The Word*

Caterpillar's pilot exercise had an effect beyond the three dealers directly involved.

> and others are starting to happen all too frequently, even though you may fully intend to totally represent Caterpillar, as your agreement requires.

"1983 Dealer Principal Meetings," p. 9, Ex. # 3.0 to Volpp's Response (Vol. 1) (emphasis added). Although the speaker is not identified within the text itself, the immediately preceding document identifies the speaker as Dean Moore. *See* Memo from RD Murphy to Parts & Service Sales Representatives (June 6, 1983), Ex. # 3.0 to Volpp's Response (Vol. 1) ("Attached are two references concerning dealers' use of competitive parts. The first is a copy of the talk Dean Moore gave to dealer principals at the meeting in Colorado Springs"). ·

**8.** *See* Memo from BJ Hansotia to Steve Larson (Oct. 4, 1984), Ex. # 3.5 to Volpp's Response (Vol. 1).

**9.** *See* Memo from TE Headington to JD Keenan (Aug. 15, 1985), Ex. # 3.15 to Volpp's Response (Vol. 1).

**10.** *See* "Dealer Parts Sourcing Loyalty," Ex. # 3.23 to Volpp's Response (Vol. 1) ("Three dealers confronted and changed"); "Dealer Sourcing Loyalty," Ex. # 3.26 to Volpp's Response (Vol. 1) ("several dealers confronted and converted"); "Dealer Sourcing Loyalty," Ex. # 3.41 to Volpp's Response (Vol. 2) ("several dealers confronted and converted").

**11.** "Dealer Sourcing Loyalty," Ex. # 3.26 to Volpp's Response (Vol. 1) ("several dealers confronted and converted"); "Dealer Sourcing Loy-

Word spread throughout the dealer network that Caterpillar was "getting serious" about the practice of selling non-genuine parts.[12] Caterpillar welcomed and encouraged this effect. Tom Headington at Caterpillar recommended that Caterpillar "take an official position strongly discouraging dealer sourcing non-genuine parts where a genuine Caterpillar part is available to the dealer from Caterpillar."[13]

The issue of non-genuine parts sales was addressed at a Caterpillar "Worldwide Marketing Management Meeting" in October of 1985 in Galesburg, Illinois. It was determined that dealers who "outsource" would be "personally contacted by district/region managers and reminded of their obligations to CTCo."[14] It was further determined that if the personal contact produced no reaction from the dealer, "one or more persuasive measures [could] be employed: suspension of parts returns; 100 percent inspection of warranty parts; [and] a dealer requirement to identify non-genuine parts on customer invoices."[15] Also at the Galesburg meeting, Caterpillar initiated a challenge to increase incremental parts sales worldwide by $200 million.[16] The emphasis on "dealer sourcing loyalty" was expected to account for $40–$50

million toward this total.[17] Caterpillar made the decision that local representatives would have a " 'Woodshed' talk" with dealers "who are into nongenuine parts" and send out a "sourcing loyalty letter."[18]

Caterpillar's official position on the issue of non-genuine parts sales went out on May 12, 1986, in the form of a letter from Dave Lewis to all dealers, region managers and district managers. The position statement was as follows:

> The basis of our agreements with dealers is our expectation that they will adequately represent the Caterpillar products designated in those agreements to our satisfaction. The use of genuine Caterpillar parts is essential to the performance of our dealers' obligation to support Caterpillar prime products and the fulfillment of their obligation to adequately represent the entire Caterpillar product line—including parts.[19]

The letter further informs the dealers that:

> District Managers will be discussing this subject with you as appropriate. I encourage those of you affected by this position to review your current sourcing and sales practices and do what is necessary to ensure your practices are consistent with the

---

alty," Ex. #3.41 to Volpp's Response (Vol. 2) ("several dealers confronted and converted").

12. Memo from JG Evans to RP Bonati (Aug. 22, 1985), Ex. #3.16 to Volpp's Response (Vol. 1) ("word is on the streets that Caterpillar is finally serious about their dealers' involvement in competitive parts."); Memo from MD Meadows to Region Managers, BR Clough, LS Goettsch, DA Lewis, & JM Tedford (Aug. 28, 1985), Ex. #5 to Volpp's Supp. Resp. ("from comments we've received, word is apparently spreading throughout the dealer organization that we are at last, getting serious about the practice of not using Caterpillar as the source for parts needs.").

13. Memo from TE Headington to JD Keenan (Aug. 15, 1985), Ex. #3.27 to Volpp's Response (Vol. 2).

14. Synopsized Minutes of Oct. 27–31 Worldwide Marketing Management Meeting in Galesburg, attached to Memo from RJ Gutierrez to DV Fites (Nov. 7, 1985), Ex. #3.24 to Volpp's Response (Vol. 1). *See also* Memo from BR Clough to RJ Gutierrez (Nov. 5, 1985), Ex. #3.24 to Volpp's Response (Vol. 1).

15. *Id.*

16. *See* Memo from MD Meadows to RP Bonati, SB Brush, DE Moore, RD Nitto, and RR Schild (Nov. 8, 1985), Ex. #3.24 to Volpp's Response (Vol. 1); Memo from JD Keenan to RC Brown, FP Cholat, PR Dalton, DW Lahti, MD Meadows, H Neilson, and BM Smith (Nov. 5, 1985), Ex. #3.26 to Volpp's Response (Vol. 1); Memo from JD Keenan to DV Fites (April 3, 1986), Ex. #3.24 to Volpp's Response (Vol. 1); Memo from DA Lewis to SB Brush, RP Bonati, DE Moore, RD Nitto, RR Schild (May 16, 1986), Ex. #3.24 to Volpp's Response (Vol. 1).

17. "Dealer Sourcing Loyalty," attached to Memo from BR Clough to RC Brown, FP Cholat, RJ Jacobson, DW Lahti, JT McCabe and HC Neilson (Feb. 7, 1986), Ex. #3.26 to Volpp's Response (Vol. 1).

18. *Id.*

19. Letter from DA Lewis to Dealer Principals, Region Managers, and District Managers (May 12, 1986), Ex. #3.35 to Volpp's Response (Vol. 2); Ex. #85 to Caterpillar's Motion (Vol III). Caterpillar has submitted proof that the author of this letter believes that dealers "certainly ... have no contractual obligations to source entirely genuine Caterpillar parts." Confidential Testi-

effective representation of Caterpillar and our common interests.[20]

### 6. Caterpillar's Instructions To District Managers On Approaching Dealers Who Sell Non–Genuine Parts

Caterpillar sent copies of this letter to all district managers in advance of its distribution to dealers. In addition to the letter, district managers were given several documents for use in communicating with dealers who sell non-genuine parts. One such document attempts to answer the question, "What do you say to the dealer who buys from competitors and says, 'why shouldn't I buy this part from your competitor? It seems like good quality and it's 25% less than your price?' "[21] The suggested response is as follows:

> [Y]ou can buy from whomever you choose—we have no control over that. But, I would ask you a similar question. Why shouldn't we sell tractors or parts to your competitor—perhaps the local Komatsu dealer? They may be happy to buy many items from us at good prices—our sales and profits could increase.[22]

The document goes on to emphasize the importance of Caterpillar and its dealers "helping each other" in their "mutual interest." It concludes with "[o]ne last question—our agreement implies that you will totally represent Caterpillar—if you do not represent us for specific items in your service territory, who should we look to be the Caterpillar representative in your territory for these items?"[23]

Caterpillar sent another "dealer sourcing" letter to district managers, with "support materials" attached, as a follow-up to the

May 12, 1986 "position statement."[24] These materials were "designed to assist [district managers] in [their] understanding of this issue, as well as future dealer discussions."[25] The first "support material" attachment is the May 12, 1986 letter from Dave Lewis itself. The second attachment is a "position statement" which states, *inter alia*, as follows:

> Today dealers consider and/or actively source for resale nongenuine parts. This practice displaces the sale of new/remanufactured genuine Caterpillar parts. It is estimated to cost NACD between $50–$100 M annually in parts sales revenue.
>
> . . . .
>
> Dealer sourcing of nongenuine parts which displace the sale of genuine Caterpillar parts for the purpose of improved gross profit is unacceptable.
>
> . . . .
>
> Districts should advise dealers that Caterpillar is committed to providing competitive prices which generate a reasonable (aggregate) return to the dealer. We realize (and so do most dealers) that there will be situations where an individual transaction may not provide this return. Nevertheless, we expect dealers to pursue the total opportunity.[26]

The third attachment is a definition of a genuine Caterpillar part: "A genuine Cat part is a part manufactured by or for Caterpillar which is sold under a Caterpillar trademark."[27]

The final "support material" attachment to Mr. Meadows' July 18, 1986 Memo includes two documents. The first is a sample copy of a "district action letter" which district man-

---

mony of David Lewis, Ex. # 84 to Caterpillar's Motion (Vol. III).

**20.** *Id.*

**21.** " 'Loyalty'—It's Not a One Way Street," attached to Memo from MD Meadows to District Managers (April 2, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2).

**22.** *Id.*

**23.** *Id.*

**24.** Memo from MD Meadows to District Managers (July 18, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2).

**25.** *Id.*

**26.** "Position Statement," Attachment II to Memo from MD Meadows to District Managers (July 18, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2) (emphasis added).

**27.** Attachment III to Memo from MD Meadows to District Managers (July 18, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2).

agers could send to dealers.[28] The second is a summary of a "successful attempt at encouraging one dealer to source only genuine CAT parts."[29] The sample "district action letter" states as follows:

> Under our dealership agreement, you have an obligation to adequately represent Caterpillar products including parts. Representation of directly competitive parts adversely affects that obligation. If you choose to stock non-genuine parts, we expect it to be only as an accommodation to customers who insist upon purchasing such parts. We would expect you to not promote such products where we provide genuine Caterpillar parts.
>
> . . . .
>
> In failing to adequately represent us, you create some serious problems which inhibit our ability to do business with ————. . . .
>
> . . . .
>
> ———— is our only dealer in ————. You have elected to eliminate your representation of certain Caterpillar products. Will the list be ever growing? If so, we may be forced to consider who will represent us in ———— for such items and whether we wish to have more than one dealer in the area.[30]

The "summary" in the final "support material" attachment to Mr. Meadows' Memo describes the manner in which Caterpillar successfully convinced one of the "pilot" dealerships to purchase all of its parts requirements from Caterpillar sources. The summary states that "[i]t is hoped that this document will be beneficial for other districts with similar problems."[31] The summary explains how Caterpillar representatives prepared for the "showdown" by gathering data indicating a "significant reduction in purchases of certain CAT parts commodities."[32] It then details the discussions with dealer principals who were called into the district office and presented with the findings. The discussion included emphasis on all of the reasons why Caterpillar felt that its parts were superior to those of its competitors. The discussion concluded with one last question to the dealer: "our agreement implies that you will totally represent Caterpillar—if you do not represent us for specific items in your service territory, who should we look to to be the Caterpillar representative in your territory for these items?"[33] The summary states that "[a]t the conclusion of the meeting, it was made clear that the dealer was free to represent any product (or parts) line they wished. However, if they chose not to completely represent our lines, we would have to seek that representation in some other fashion."[34] Caterpillar then gave the dealer one week to give notice of

---

28. Sample Letter, Attachment IV to Memo from MD Meadows to District Managers (July 18, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2).

29. "Summary ... [of] successful attempt at encouraging one dealer to source only genuine CAT parts" (June 11, 1986), Attachment IV to Memo from MD Meadows to District Managers (July 18, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2).

30. Sample Letter, Attachment IV to Memo from MD Meadows to District Managers (July 18, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2) (emphasis in original).

   This form letter appears to have been derived from a letter sent to Rozier Machinery Co. from the Jacksonville District Manager. *See infra* note 66, and accompanying text; Letter from RF Noonan to Dabo Dabasinskas, Rozier Machinery Co. (Feb. 20, 1986), Ex. # 3.28c to Volpp's Response (Vol. 2). That dealer responded by objecting to "the threatening nature of the letter." Letter from G. Robert Blanchard to RF Noonan (March 13, 1986), Ex. # 3.28d to Volpp's Response (Vol.

2); *but see* Aff. of G. Robert Blanchard, Ex. # 73 to Caterpillar's Motion (Vol. II) ("In retrospect, my language [about the 'threatening nature' of Mr. Noonan's letter] was poorly chosen. I knew Mr. Noonan was not threatening me or the dealership in a literal sense."). The dealership subsequently terminated purchases of all non-genuine parts. *See* Letter from Chuck Bacon to Bob McCreary (March 4, 1986), Ex. # 3.28d to Volpp's Response (Vol. 2); *see also* Letter from RF Noonan to Dabo Dabasinskas (May 2, 1986), Ex. # 3.28e to Volpp's Response (Vol. 2).

31. "Summary ... [of] successful attempt at encouraging one dealer to source only genuine CAT parts" (June 11, 1986), Attachment IV to Memo from MD Meadows to District Managers (July 18, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2).

32. *Id.*

33. *Id.* (emphasis added).

34. *Id.* (emphasis added).

which course of action they would be taking. The summary concludes by stating that the dealer decided "to completely represent CAT parts" and that the dealership continues to be "clean." [35]

### 7. Caterpillar's Response To An Anonymous Tip

In late 1986, Caterpillar received a letter from an anonymous "concerned but loyal Caterpillar dealer" who informed the company that certain dealers were selling non-genuine parts through their used parts departments.[36] A handwritten note on that letter indicates that a Caterpillar representative "will address it in [his] NACD remarks ... to the extent agreeable by legal." [37] Mr. D.V. Fites then had this to say at the September 1986 NACD Dealer Meeting:

> And speaking of winning the battle and losing the war, let me raise one further point in the strongest terms possible. We have recently received a report indicating that several dealers are involved in the nongenuine parts business through their used parts operations. We are currently in the process of investigating this report. Let me just say that I urge all of you to examine your used parts activities. If you are in the nongenuine parts business, I urge you to get out. If you're not in it, don't get in. I can think of nothing more injurious to our mutual long-term future than assisting competitive parts manufacturers to gain a stronger market position through our own distribution organization.[38]

### 8. The Success Of Caterpillar's Campaign

Caterpillar's efforts to reduce sales of non-genuine parts by Caterpillar dealers proved quite successful. Sales of Caterpillar parts increased as dealers dropped or decreased their sales of non-genuine parts in favor of genuine Caterpillar parts. Similarly, CEM lost sales to Caterpillar dealers, while their sales in other markets continued to grow.[39] At issue in the instant litigation is whether Caterpillar's attempts to increase parts sales, in the manner in which it did, were improper.

### 9. Caterpillar's Proof

Caterpillar submitted, *inter alia*, seventy-eight affidavits from employees (usually presidents, vice-presidents, chairmen of the board, or other executive positions) at various Caterpillar dealerships throughout the United States. The affidavits detail the policies and practices at dealerships with respect to purchasing parts from sources other than Caterpillar. The affidavits also describe the reasons behind such policies and practices. A common theme in almost every affidavit is either (1) assurances that Caterpillar has not threatened, pressured or coerced the dealership on the issue of purchasing non-genuine parts, or (2) assurances that policy decisions at the dealership are not based on threats, pressure or coercion.[40] Caterpillar submitted additional evidence challenging Volpp's substantive claims [41] as well as Volpp's damage theory.[42]

### 10. Volpp's Proof

In addition to the proof discussed *supra*, Volpp has submitted volumes of anecdotal

**35.** *Id.*

**36.** *See* Letter from "A concerned but loyal Caterpillar dealer" to Mr. George Schaefer (Aug. 15, 1986), Ex. # 3.40 to Volpp's Response (Vol. 2).

**37.** *Id.*

**38.** D.V. Fites Comments at September 1986 NACD Meeting, Ex. # 3.40 to Volpp's Response (Vol. 2) (emphasis added).

**39.** Decl. of Larry Gray, Ex. # 1.0 to Volpp's Response (Vol. 1).

**40.** Only two of Caterpillar's seventy-eight affidavits lack such a statement. *See* Aff. of Gregory

Poole, Jr., Ex. # 26 to Caterpillar's Motion (Vol. I); Aff. of John R. Traynham, Ex. # 76 to Caterpillar's Motion (Vol. II).

**41.** *See, e.g.,* Pl.'s Second Resp. to Caterpillar's First Request for Admissions, Ex. # 80 to Caterpillar's Motion (Vol. III); Confidential Testimony of Donald V. Fites, Ex. # 83 to Caterpillar's Motion (Vol. III); Confidential Testimony of David Lewis, Ex. # 84 to Caterpillar's Motion (Vol. III).

**42.** *See* Dep. of Craig Walter Kugler, Ex. # 89 to Caterpillar's Motion (Vol. III).

evidence pertaining to Caterpillar's communications with various specific dealerships.[43] Much of this evidence is inadmissible hearsay, particularly the evidence contained in "Sales Call Reports" and "Unfair Competition Reports" prepared by CEM to describe conversations with employees at several Caterpillar dealerships.[44] However, much of the evidence, described *infra*, is admissible.

As noted, one tactic used by Caterpillar to increase parts sales was to inform dealers identified as sellers of non-genuine parts that Caterpillar would take certain protective measures. Among them were: (1) requiring inspections of all warranty claims submitted by the dealer, and (2) suspension or auditing of all year-end parts returns.[45] Volpp has conceded that these measures are reasonable when employed in order to protect the integrity of Caterpillar's warranty and parts return programs.[46] However, Volpp has submitted evidence to indicate that Caterpillar may have intended these measures not to further these reasonable goals but in order to "punish" or "sanction" dealers for selling non-genuine parts.[47] In addition, Volpp has submitted evidence to suggest that Caterpillar was acting with an intent to flex its

---

**43.** Some of Volpp's evidence indicates that in communicating with dealers Caterpillar emphasized that dealers were free to make their own business decisions. *See* Letter from DP Walsh to Omer Lamkin (Nov. 19, 1984), Ex. # 3.8 to Volpp's Response (Vol. 1) ("we are acutely aware Whayne Supply Company is an independent business and as such has the right to sell any product, to any customers in any area") ("We have no desire to 'force' our dealers into buying genuine parts solely as a method of extending our profitability"); Memo from JG Evans to RP Bonati (July 31, 1985), Ex. # 3.16 to Volpp's Response (Vol. 1) ("I made myself clear that Taylor Machinery Company could sell to whomever they chose"); Memo from JG Evans to RP Bonati (Aug. 22, 1985), Ex. # 3.16 to Volpp's Response (Vol. 1) ("I made myself clear that Taylor Machinery Company could represent any product (or parts) line they wished"); " 'Loyalty'—It's Not a One Way Street," attached to Memo from MD Meadows to District Managers (April 2, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2) ("We have no control over dealers' decisions to sell or not sell competitive parts"); "Summary . . . [of] successful attempt at encouraging one dealer to source only genuine CAT parts" (June 11, 1986), Attachment IV to Memo from MD Meadows to District Managers (July 18, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2) ("At the conclusion of the meeting, it was made clear that the dealer was free to represent any product (or parts) line they wished").

**44.** Volpp has submitted a motion to strike affidavits and Caterpillar has submitted a motion in limine which it wishes to have considered together with the instant motion for summary judgment. At issue in both motions is the admissibility of certain dealer affidavits, unfair competition reports and sales call reports submitted in connection with the instant motion for summary judgment.

The parties have stipulated and agreed that "it would be onerous for the Court to make individual rulings on the admissibility of all or part of each such dealer affidavit, unfair competition report or sales call report proffered by the parties." Stipulation and Order at 2 (filed June 16,

1994). Thus, for purposes of the instant motion for summary judgment, the parties have agreed "to relinquish any right that they may have to such individual rulings." *Id.* But, should either party find a need for specific individual rulings, a motion to that effect may be filed.

**45.** *See, e.g.*, Memo from RJ Gutierrez (Nov. 7, 1985), Ex. # 3.24 to Volpp's Response (Vol. 1); Memo from BR Clough (Nov. 5, 1985), Ex. # 3.24 to Volpp's Response (Vol. 1); Letter from DP Walsh to Omer Lamkin, Whayne Supply Co. (Dec. 14, 1984), Ex. # 3.8a to Volpp's Response (Vol. 1); Dep. of J. William Pullen, Ex. to Pl.'s Supp.Mem. to Caterpillar Inc.'s Mot. for Summ.J. ("Volpp's Supp. Response").

**46.** In response to requests for admissions, Volpp has admitted that "[i]t is reasonable for Caterpillar to protect the integrity of its warranty system by refusing to honor claims that do not involve the failure of genuine Caterpillar parts." Pl.'s Second Resp. to Caterpillar's First Request for Admissions ¶ 423, Ex. # 80 to Caterpillar's Motion (Vol. III). Volpp has also admitted that "[i]t is reasonable for Caterpillar to protect the integrity of its annual parts return program by refusing to accept the return of non-genuine parts." Pl.'s Second Resp. to Caterpillar's First Request for Admissions ¶ 425, Ex. # 80 to Caterpillar's Motion (Vol. III).

**47.** *See, e.g.*, Memo from JM DeLuca to JG Evans (Nov. 26, 1985), Ex. # 3.16 to Volpp's Response (Vol. 1) & Ex. # 3.18 to Volpp's Response (Vol. 1) ("sanctions"); Synopsized minutes of Oct. 27–31 Worldwide Marketing Management Meeting in Galesburg, attached to Memo from RJ Gutierrez to DV Fites (Nov. 7, 1985), Ex. # 3.24 to Volpp's Response (Vol. 1) ("persuasive measures"); Memo from BR Clough to RJ Gutierrez (Nov. 5, 1985), Ex. # 3.24 to Volpp's Response ("persuasive measures"); Memo from BR Clough to RC Brown, FP Cholat, RJ Jacobson, DW Lahti, JT McCabe, & HC Neilson (Feb. 7, 1986), Ex. # 3.26 to Volpp's Response (Vol. 1) ("punitive measures").

muscle over dealers in attempting to increase sales of genuine Caterpillar parts.[48] Some evidence suggests that this intention was communicated directly to dealers.[49] Ultimately, Caterpillar's only power over dealers is cancellation of the dealership.[50] However, to this court's knowledge of the record, Caterpillar has never terminated a dealership on the basis of non-genuine parts sales.

On some occasions in communicating with dealers, Caterpillar characterized the practice of selling non-genuine parts in such a way that a reasonable dealer could conclude that Caterpillar regarded the practice as a violation of the dealer's contractual obligations under the Sales and Service Agreement.[51] Caterpillar did this by describing the practice of selling non-genuine parts and then stating that this may be occurring despite the dealer's intention to "totally represent Caterpillar, as the agreement requires." [52]

### (a) Boyce Machinery

Volpp has submitted evidence that a Caterpillar representative named Tom Neely made an arguably threatening statement to an employee at Boyce Machinery Co. Boyce had been involved in purchasing non-genuine parts, including CEM parts, beginning in the early 1980s. When Mr. Neeley began making telephone inquiries, Boyce employees took actions to hide their purchases of non-genuine parts because they felt Mr. Neeley would "disapprove." [53] On at least one occasion, Mr. Neeley did disapprove.[54] At a later time, in reference to the purchase of non-genuine parts at other dealerships, Mr. Neeley indicated to Paul Hubert, Inventory Control Manager at Boyce, that "somebody could lose their contract over it—somebody could lose their dealership over it." [55] Boyce "slowed down" their outside purchases for

---

**48.** See, e.g., Memo from DE Moore to District Managers (Dec. 11, 1984), Ex. # 3.9 to Volpp's Response (Vol. 1) ("We expect dealers to purchase their parts and remanufactured components from Caterpillar sources") (emphasis added); Memo from TE Headington to JD Keenan (Aug. 15, 1985), Ex. # 3.15 to Volpp's Response (Vol. 1) ("CTCo. should take an official position strongly discouraging dealer sourcing non-genuine parts where a genuine Caterpillar part is available to the dealer from Caterpillar") (emphasis added); Memo from JM DeLuca to JG Evans (July 24, 1985), Ex. # 3.16 to Volpp's Response (Vol. 1) ("we should demand Taylor [Machinery Co.] remove all non-genuine parts from their main and branch stores within five working days") (emphasis added).

   See also Memo from JD Keenan to RC Brown, FP Cholat, PR Dalton, DW Lahti, MD Meadows, H Neilson and BM Smith (Nov. 5, 1985), Ex. # 3.26 to Volpp's Response (Vol. 1). This memo requests input on several items, including ideas for increasing incremental sales. Those ideas are attached to the memo on a sheet styled, "Some Additional Potential Incremental Sales Possibilities." One idea listed on the sheet is "Regain dealer sourcing loyalty." An unknown individual has crossed through the word "Regain" and has written the following below: "Not regain, but demand—should not even be open to discussion" (emphasis added).

**49.** See, e.g., Memo from TE Headington to JD Keenan (Aug. 15, 1985), Ex. # 3.15 to Volpp's Response (Vol. 1) ("District is taking a strong posture [with Taylor Machinery Co.] and fully expects the dealer's commitment to stop.") (emphasis added); Memo from JG Evans to RP Bonati (Aug. 9, 1985), Ex. # 3.16 to Volpp's Response (Vol. 1) ("Jon Thompson and Ed New-

ton ... were confronted regarding their involvement in selling competitive parts and their active pursuit of parts, service, and machine sales outside their service territory. Although he initially denied participation in this activity, Jon later confessed his intent ... when confronted with overwhelming evidence") (emphasis added).

**50.** See, e.g., Memo from RD Page to BR Clough (Oct. 22, 1985), Ex. # 3.27 to Volpp's Response (Vol. 2) ("Ultimately there is still no identified basis for enforcement short of threat of cancellation.").

**51.** See "1983 Dealer Principal Meetings," p. 9, Ex. # 3.0 to Volpp's Response (Vol. 1); see also " 'Loyalty'—It's Not a One Way Street," attached to Memo from MD Meadows to District Managers (April 2, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2); Sample Letter, Attachment IV to Memo from MD Meadows to District Managers (July 18, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2); "Summary ... [of] successful attempt at encouraging one dealer to source only genuine CAT parts" (June 11, 1986), Attachment IV to Memo from MD Meadows to District Managers (July 18, 1986), Ex. # 3.36 to Volpp's Response (Vol. 2).

**52.** Id.

**53.** Hubert Dep., pp. 37–43; Trosclair Dep., pp. 15–16, 71–73, 78.

**54.** Hubert Dep. at 37–43.

**55.** Hubert Dep. at 44.

two or three months because such purchases made Caterpillar "unhappy."[56]

### (b) Carlton Co.

Volpp has submitted evidence that Carlton Co. attempted to prevent Caterpillar from discovering its purchases of CEM parts.[57] Carlton would split its orders for seals and gaskets between Caterpillar parts and CEM parts in order to hide the CEM purchases.[58]

### (c) Mustang Tractor Co.

As noted, Mustang Tractor Co. was one of three dealerships selected by Caterpillar in its "pilot exercise."[59] Caterpillar representatives had discussions with Mustang about its practice of selling non-genuine parts. The result of those discussions was that Mustang was to "develop an action plan to return to sourcing from Cat."[60] Caterpillar "directed" Mustang to "[s]electively disengage from most [of its]" alternatively sourced parts business by the end of November 1985.[61] Mustang was permitted to continue dealing with CEM "for now."[62] Mustang later agreed to "stop doing business with CEM ... in exchange for [Caterpillar's] assistance on hydraulic and turbocharger repair option development."[63]

### (d) Rozier Machinery Co.

Caterpillar learned about Rozier's practice of buying from alternative sources. Caterpillar representatives asked "about the quality of the parts, [stated] the fact that they were unhappy with the fact that [Rozier was] doing it, and [stated] that there was an agreement between Caterpillar and the dealers that parts would be purchased, replacement parts would be purchased from Caterpillar."[64] Caterpillar pressed this in terms of an obligation.[65]

The district manager of the Jacksonville District at Caterpillar, Mr. R.F. Noonan, sent a letter to Dabo Dabasinskas, the General Manager at Rozier, on February 26, 1986. That letter stated as follows:

> Under our dealership agreement you have an obligation to adequately represent Caterpillar products including parts. Representation of directly competitive parts adversely affects that obligation. If you choose to stock non-genuine parts, we expect it to be only as an accommodation to customers who *insist* upon purchasing such parts. We would expect you to not promote such products where we provide genuine Caterpillar parts.
>
> . . . .
>
> In failing to adequately represent us, you create some serious problems which inhibit our ability to do business with Rozier. . . .
>
> . . . .
>
> Rozier is our only dealer in central Florida. You have elected to eliminate your representation of certain Caterpillar products. Will the list be ever growing? If so, we may be forced to consider who will represent us in central Florida for such items and whether we wish to have more than one dealer in the area.[66]

The letter from Mr. Noonan prompted an angry response from the dealer principal at Rozier, Mr. Robert Blanchard. Mr. Blanch-

---

56. Hubert Dep., pp. 53–55.

57. Dep. of William Gerald Grimsley, Jr., Ex. #3.39 to Volpp's Response (Vol. 2).

58. *Id.*

59. *See supra* notes 7–10, and accompanying text.

60. Memo from TE Headington to JD Keenan (Aug. 15, 1985), Ex. #3.15 to Volpp's Response (Vol. 1).

61. Memo from Jeff Alt to John Chalmers (September 9, 1985), Ex. #5 to Dep. of John C. Chalmers, Volpp's Supp. Response.

62. *Id.*

63. *Id.*

64. Dep. of James T. Badger, Ex. #3.28b to Volpp's Response (Vol. 2).

65. *Id.*

66. Letter from RF Noonan to Dabo Dabasinskas (Feb. 20, 1986), Ex. #3.28c to Volpp's Response (Vol. 2) (emphasis in original). As noted, this letter appears to be the source for a "sample letter" sent to all district managers as a model for addressing the problem of alternatively sourced parts with dealers. *See supra* note 30, and accompanying text; Sample Letter, Attachment IV to Memo from MD Meadows to District Managers (July 18, 1986), Ex. #3.36 to Volpp's Response (Vol. 2).

ard wrote to Mr. Noonan and objected to "the threatening nature of the letter."[67]

In early 1986, Rozier decided to stop buying outside parts "because Caterpillar was unhappy and [Caterpillar was] telling [Rozier] they were very unhappy about it."[68] Chuck Bacon at Rozier notified CEM by letter that it would no longer be purchasing CEM products.[69] Mr. Bacon expressed "regret" at "having to write this letter."[70]

### (e) Taylor Machinery Co.

As noted, Taylor Machinery Co. was one of three dealerships selected by Caterpillar in its "pilot exercise."[71] Caterpillar representatives had discussions with Taylor about their practice of selling non-genuine parts. The district management took a "strong posture" and "fully expect[ed] the practice to stop."[72] Mr. J.G. Evans from Caterpillar "confronted" Jon Thompson and Ed Newton at Taylor with "overwhelming evidence" of Taylor's involvement in competitive parts.[73] Mr. Thompson eventually "confessed," and Mr. Evans asked them to "consider the consequences of their actions."[74] Mr. Evans met later with Mr. Thompson on August 13, 1985, making himself clear that Taylor was free to purchase from whomever it chose. Mr. Evans then stated that "if [Taylor] chose not to completely represent [Caterpillar's]

lines, [Caterpillar] would have to seek that representation in some other fashion."[75]

Taylor made the decision to purchase parts only from Caterpillar in order to "clear their bad name" and have all "sanctions" against them removed.[76] Taylor apparently stood by this decision and "cleaned up their act," dealing solely with genuine Caterpillar parts.[77]

### (f) West Texas Equipment Co.

Volpp has submitted evidence that Mr. Burdett at Caterpillar approached Mr. Bill Caudy at West Texas Equipment Co. (West Texas was involved in selling parts from CEM and S.K. Wellman) and "[i]n a heavy handed manner and tone," asked why and where Caudy was buying these non-genuine parts.[78] Mr. Burdett then told Mr. Caudy "in an accusatory tone" that West Texas Equipment was the only dealership in the territory that was buying competitive parts.[79] Shortly after this confrontation, Mr. Burdett's boss, Mr. Stephenson, instructed Mr. Burdett to stop all outside purchasing.[80]

### (g) Whayne Supply Co.

In late 1984, Mr. Dan Walsh at Caterpillar sent a letter to Mr. Omer Lamkin at Whayne Supply Co. That letter stated, in pertinent part, as follows:

> This letter expresses our concern over Whayne's current practice of sourcing non-genuine parts and reiterates some of our

---

**67.** Letter from G. Robert Blanchard to R.F. Noonan (March 8, 1986), Ex. #3.28d to Volpp's Response (Vol. 2). *See supra* note 29. Mr. Blanchard subsequently recanted his objection to Mr. Noonan's letter. Aff. of G. Robert Blanchard, Ex. #73 to Caterpillar's Motion (Vol. II) ("In retrospect, my language [about the 'threatening nature' of Mr. Noonan's letter] was poorly chosen. I knew Mr. Noonan was not threatening me or the dealership in a literal sense").

**68.** Dep. of James T. Badger, Ex. #3.28b to Volpp's Response (Vol. 2).

**69.** Letter from Chuck Bacon to Bob McCreary (March 4, 1986), Ex. #3.28d to Volpp's Response (Vol. 2).

**70.** *Id.*

**71.** *See supra* notes 8–11, and accompanying text.

**72.** Memo from TE Headington to JD Keenan (Aug. 15, 1985), Ex. #3.15 to Volpp's Response (Vol. 1).

**73.** Memo from JG Evans to RP Bonati (Aug. 9, 1985), Ex. #3.16 to Volpp's Response (Vol. 1).

**74.** *Id.*

**75.** Memo from JG Evans to RP Bonati (July 31, 1985), Ex. #3.16 to Volpp's Response (Vol. 1) (*emphasis added*); *see also* Memo from JG Evans to RP Bonati (Aug. 22, 1985), Ex. #3.16 to Volpp's Response (Vol. 1).

**76.** Memo from JM DeLuca to JG Evans (Nov. 26, 1985), Ex. #3.16 to Volpp's Response (Vol. 1) and Ex. #3.18 to Volpp's Response (Vol. 1).

**77.** Memo from JG Evans to MD Meadows (Dec. 12, 1985), Ex. #3.18 to Volpp's Response (Vol. 1).

**78.** Decl. of Bill Caudy (filed March 9, 1992).

**79.** *Id.*

**80.** *Id.*

opinions as to "why you should buy from us". At the advent, let me say we are acutely aware Whayne Supply Company is an independent business and as such has the right to sell any product, to any customers in any area. We, as a supplier to Whayne, have an obligation to provide you with quality, high-value products which you can merchandise at a profit. You and I both know the Caterpillar/dealer enterprise has grown far above that simple definition—and I propose its success is due largely to that increased commitment. We also haven't lost track of the success you have had with the Caterpillar products you do represent.

Omer, no doubt due to the difficult economy, some current suppliers and numerous other companies have increased their efforts to secure a portion of your parts orders. While we all may be surprised to the extent this happens in the Caterpillar family, we suspect it isn't management's intention, but rather the action of some well-intentioned employee. What results is dealers that fully intend to represent CAT (as the agreement requires) find themselves offering competitive parts....[81]

The letter goes on to detail many of the advantages of Caterpillar parts, including product quality, distribution, price and other concerns. It concludes as follows:

.... That Whayne has chosen to use non-genuine parts is very disturbing. Situations such as these severely limit your Caterpillar contacts' motivation to "fight" for your special requests (i.e. re-instating the GET Specialist or increasing our participation in u/c merchandising)....

....

We are committed to merchandising our parts only through a strong Caterpillar dealer organization. We ask you to make a similar commitment in return.[82]

Mr. Lamkin responded to Mr. Walsh by defending Whayne's practice of purchasing a "limited" quantity of non-genuine parts.[83] Mr. Walsh then notified Mr. Lamkin that Caterpillar would "monitor all transmission warranty claims until source of the parts and cause of failure can be verified."[84] Mr. Walsh also notified Mr. Lamkin that "similar limitations" would be required on Whayne's surplus parts returns.[85] Mr. Walsh informed Mr. Lamkin that these were protective measures to be put in place "[u]ntil [Caterpillar] can respond to [Whayne's] concerns and regain [Whayne's] business."[86]

Whayne Supply Co. thereafter changed its policy and ceased the practice of buying competitive parts for stock.[87] Whayne's new policy permitted the purchase of non-genuine parts only in repairing downed machines and only where unacceptable delays in delivery prevented the use of authorized parts.[88] Whayne's new policy absolutely prohibited the purchase of competitive parts where the part was "such that its failure would lead to potential warranty claims against the manufacturer if it should fail."[89] This was viewed as a "positive action" by Caterpillar.[90]

## II. DISCUSSION

### 1. Summary Judgment Standards

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

81. Letter from DP Walsh to Omer Lamkin (Nov. 19, 1984), Ex. # 3.8 to Volpp's Response (Vol. 1).

82. Id.

83. Letter from Omer Lamkin to Dan Walsh (Dec. 14, 1984), Ex. # 3.8a to Volpp's Response (Vol. 1).

84. Letter from DP Walsh to Omer Lamkin (Feb. 14, 1985), Ex. # 3.8a to Volpp's Response (Vol. 1).

85. Id.

86. Id.

87. Memo from Frank Applegate to Byrl Bell (July 31, 1985), Ex. # 3.8b to Volpp's Response (Vol. 1).

88. Id.

89. Id.

90. Memo from D Waddilove to MD Meadows (Aug. 7, 1985), Ex. # 3.8b to Volpp's Response (Vol. 1).

the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56(c). Rule 56(c) mandates the entry of summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim, but does require a showing of an absence of evidence supporting the non-moving party's case. *U.S. v. Currency $267,961.07*, 916 F.2d 1104, 1108 (6th Cir.1990) (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53).

■ The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512). No genuine issue for trial exists "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all justifiable inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Id.* at 255, 106 S.Ct. at 2513–14.

■ Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. *Fed.R.Civ.P.* 56(c), (e). To establish a genuine issue of fact the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *Pierce*, 40 F.3d at 800. The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Pierce*, 40 F.3d at 800. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

The Supreme Court has affirmed the appropriateness of summary judgment in antitrust cases. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 468, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992) ("If plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted); *Matsushita*, 475 U.S. 574, 106 S.Ct. 1348 (antitrust conspiracy claim dismissed because of plaintiffs' failure, after several years of detailed discovery, to put forward significant probative evidence of the alleged conspiracy); *First Nat'l Bank of Arizona, etc. v. Cities Serv. Co.*, 391 U.S. 253, 284–90, 88 S.Ct. 1575, 1590–93, 20 L.Ed.2d 569 (1968); *White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 699–700, 9 L.Ed.2d 738 (1963). Here, both parties have engaged in significant discovery, and in the absence of any material factual dispute, summary judgment is an appropriate procedural tool for this case.

The Sixth Circuit has also recognized the propriety of summary judgment in antitrust

cases. *See, e.g., Bouldis v. Suzuki Motor Corp.*, 711 F.2d 1319, 1324–25 (6th Cir.1983); *Smith M.D. v. Northern Michigan Hosp., Inc.*, 703 F.2d 942, 947–48 (6th Cir.1983). Therefore, the court agrees with defendant's assertion that if it demonstrates that no factual dispute is present and that it should prevail as a matter of law, summary judgment should be rendered in its favor.

### 2. *Volpp's Federal Antitrust Claims (Counts I and II)*

Volpp has alleged two federal antitrust claims in its complaint (Counts I and II).

**91.** Section 1 of the Sherman Act provides as follows:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1 (1985). The punishments provided for in this provision were increased by amendment in 1990. *See* Antitrust Amendments Act of 1990, Pub.L. No. 101–588, § 4(a), 104 Stat. 2879, 2880 (1990) (now codified at 15 U.S.C. § 1). The amended provisions are not applicable to the instant complaint.

**92.** Section 3 of the Clayton Act provides as follows:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14 (1985).

**93.** Section 4 of the Clayton Act provides, in pertinent part, as follows:

Count I alleges unlawful "tying" arrangements under both Section 1 of the Sherman Act [91] and Section 3 of the Clayton Act. [92] Count II alleges unlawful combination and conspiracy under Section 1 of the Sherman Act. Volpp has standing to bring this action for injunctive relief, treble damages, and costs, including a reasonable attorney's fee, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, [93] and Section 16 of the Clayton Act, 15 U.S.C. § 26. [94]

The Supreme Court has explained the purpose of the Sherman Act as follows:

The Sherman Act was designed to be a comprehensive charter of economic liberty

(a) Amount of recovery; prejudgment interest.... [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances. In determining whether an award is just in the circumstances, the court shall consider only—

(1) whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

(2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

(3) whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof.

15 U.S.C. § 15 (1985).

**94.** Section 16 of the Clayton Act provides, in pertinent part, as follows:

Injunctive relief for private parties; exception; costs. Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ... when and under

aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition.

*Northern Pac. R.R. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). The Court has consistently held that Section 1 of the Sherman Act only proscribes *unreasonable* restraints of trade. *See Business Elec. Corp. v. Sharp Elec. Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 1518–19, 99 L.Ed.2d 808 (1988) (citing those cases).

Section 3 of the Clayton Act was intended "to complement the Sherman Act and to facilitate achievement of its purposes by reaching, in their incipiency, acts and practices that promise, in their full growth, to impair competition in interstate commerce." *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 201, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974). Specifically, Section 3 of the Clayton Act intended to declare illegal "contracts of sale made upon the agreement or understanding that the purchaser shall not deal in the goods of a competitor or competitors of the seller, which may 'substantially lessen competition or tend to create a monopoly.'" *Standard Co. v. Magrane–Houston Co.,* 258 U.S. 346, 356, 42 S.Ct. 360, 362, 66 L.Ed. 653 (1922).

### (a) Volpp's Tying Arrangement Claim (Count I)

#### i. *Elements of a Tying Claim*

■ A tying arrangement is "an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product, *or at least agrees that he will not purchase that product from any other supplier.*" *Northern Pacific,* 356 U.S. at 5–6, 78 S.Ct. at 518 (emphasis added). A tying arrangement may violate either Section 3 of the Clayton Act or Section 1 of the Sherman Act. *Davis v. Marathon Oil Co.,* 528 F.2d 395, 398 (6th Cir.1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976).

The Clayton Act makes it "unlawful for a person engaged in commerce" to "make a sale or contract for sale of goods" on the "condition, agreement or understanding that the ... purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessee or seller, where the effect of such ... sale[ ] or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14. Although the language of the Clayton Act does not specifically address tying claims, concern regarding the "anticompetitive character of tying arrangements" was expressed during the enactment of § 3. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 10, 104 S.Ct. 1551, 1557, 80 L.Ed.2d 2 (1984); *See* H.R.Rep. No. 627, 63d Cong., 2d Sess., 101–3 (1914); S.Rep. No. 698 63d Cong., 2d Sess., 6–9 (1914). Thus, the language of the Clayton Act coupled with its legislative history provided an impetus for the courts' subsequent development of tying arrangement theory.

■ A tying arrangement may violate Section 1 of the Sherman Act "if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 462, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265 (1992) (quoting *Fortner Enters., Inc. v. United*

the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue.... In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.
15 U.S.C. § 26 (1985).

*States Steel Corp.*, 394 U.S. 495, 503, 89 S.Ct. 1252, 1258–59, 22 L.Ed.2d 495 (1969)). Many tying arrangements have long been considered unreasonable restraints of trade under the Sherman Act. *See Int'l Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *Fortner Enters., Inc.*, 394 U.S. 495, 89 S.Ct. 1252. Tying claims may violate Section 3 of the Clayton Act pursuant to the same test as the Sherman Act if the tie-in involves goods, wares, merchandise or other commodities. *Jefferson Parish*, 466 U.S. at 23–24, n. 39, 104 S.Ct. at 1564–1565, n. 39 (same substantive standards used by Sherman and Clayton Acts); *Bouldis*, 711 F.2d at 1330; *Marathon Oil Co.*, 528 F.2d at 398 ("The standard of illegality under the two statutes [Sherman and Clayton Acts] are similar.").

■ The Supreme Court has set forth two distinct methods of proving an unlawful tying arrangement pursuant to Section 3 of the Clayton Act and Section 1 of the Sherman Act.

> The first employs a presumption that an agreement is an antitrust violation, thus invoking a *per se* illegality rule to classify the agreement; the second, called "rule of reason" analysis, "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition."

*Lie v. St. Joseph Hosp.*, 964 F.2d 567, 569 (6th Cir.1992) (quoting *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982)). Therefore, the two acknowledged methods of proving the existence of a tying arrangement are the *per se* and "rule of reason" approaches. In determining which analysis the court should apply, it must first decide whether the specific factual context of this case warrants *per se* treatment. *See Business Electronics*, 485 U.S. at 726, 108 S.Ct. at 1520–21 (there is a "presumption in favor of the rule-of-reason standard, [and] departure from that standard must be justified by demonstrable economic effect"); *Smith Mach. Co. Inc. v. Hesston Corp.*, 878 F.2d 1290, 1296 (10th Cir.1989), *cert. denied*, 493 U.S. 1073, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990) (*per se* rules appro-

priate only for "conduct that is manifestly anticompetitive," . . . [and] "ordinarily rule of reason analysis should be employed to determine whether a practice violates the Sherman Act") (citing *Business Electronics*, 485 U.S. at 723–24, 108 S.Ct. at 1518–20).

### ii. *Vertical Non–Price Restraints: Line Forcing v. Tying Arrangements*

■ The facts of this case resemble a line forcing situation where "a manufacturer agrees to license or grant a franchise to a dealer to sell its products only if the dealer sells a full or representative line of those products." David Pester, *Antitrust Law: Removing the Confusion in Tying Arrangement Jurisprudence*, 1990 Ann.Surv.Am.L. 699, 737 (1992). Line-forcing is, to a great extent, a type of tying arrangement. *Id.* at 741. The plaintiff in this case alleges that Caterpillar is "forcing" its dealers to fully stock Caterpillar parts. However, in the typical line-forcing arrangement competitors of the defendant manufacturer are not foreclosed from selling to the dealer; the dealer is simply forced to carry a full line of the manufacturer's products (including some products the dealer may not have wanted, or may have chosen to buy elsewhere). *See Smith Machinery*, 878 F.2d at 1296 (In most line-forcing situations the manufacturer does not prohibit the dealer from carrying competing lines). In the instant case, Volpp claims that not only is Caterpillar requiring that its dealers fully stock genuine parts, but that Caterpillar is also foreclosing competitors, such as itself, from selling non-genuine parts to its dealers. Therefore, although this case has some characteristics generally associated with a line-forcing arrangement, it is not wholly representative of a pure line-forcing situation. Instead, this case most closely resembles a line-forcing exclusive dealing arrangement because the manufacturer is forcing the dealer to buy its full line, to the exclusion of all other competitors. *See Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 779, 130 L.Ed.2d 673 (1995) (involving an exclusive dealing line-forcing arrangement).

Plaintiff alleges that Caterpillar unlawfully tied sales of its equipment to sales of Caterpillar replacement parts, ·thereby excluding Caterpillar's competitors in the parts market from access to Caterpillar dealerships. Plaintiff contends that Caterpillar sales of machinery represent the tying product, while replacement parts are the tied product. For the purposes of this portion of the analysis, the court will accept those allegations of plaintiff's as true and will assume the presence of a tie. With this assumption, the court will focus its inquiry on whether or not that tie is illegal. *See Jefferson Parish,* 466 U.S. at 11, 104 S.Ct. at 1558 (finding that not all tying arrangements, or refusals to sell two products separately, necessarily restrain competition).

The distinction between line-forcing and traditional tying arrangements is significant because several courts have treated them differently when deciding whether a particular scenario violates the antitrust laws. Pester, *Removing the Confusion* at 737; *see Smith Machinery,* 878 F.2d 1290; *Parts & Electric I v. Sterling Electric, Inc.,* 826 F.2d 712 (7th Cir.1987), *aff'd, Parts & Electric II v. Sterling Electric, Inc.,* 866 F.2d 228 (7th Cir.1988), *cert. denied,* 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989). Most importantly, some courts have held that *per se* treatment is inappropriate for line-forcing situations and that in such cases rule of reason analysis should be applied. *Id.* Because the court finds persuasive the position that the circumstances underlying line-forcing are different from standard tie-in arrangements, the court adopts the analysis of those courts that have recognized the distinction. Thus, in considering that the facts of this case fall somewhere between pure line-forcing and a tie, the question before the court becomes whether or not *per se* analysis is appropriate here. While reconciling these competing principles, the court remains mindful of the admonition of the *Jefferson Parish* Court that "[t]he legality of [the challenged] conduct depends on its competitive consequences, not on whether it can be labeled 'tying.'" 466 U.S. at 21 n. 34, 104 S.Ct. at 1563 n. 34. Therefore, because the facts of this case do not fall clearly within any pre-delineated scenario, the court abandons the myriad of confusing labels in favor of following the basic principles underlying antitrust law. *See Eastman Kodak,* 504 U.S. at 466, 112 S.Ct. at 2082 ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.").

### iii. *Smith Machinery & Roy B. Taylor Sales*

Most significant to the court's analysis are the Tenth Circuit's decision in *Smith Mach. Co. v. Hesston Corp.,* 878 F.2d 1290 (10th Cir.1989), *cert. denied,* 493 U.S. 1073, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990), and the Fifth Circuit's decision in *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 779, 130 L.Ed.2d 673 (1995). In *Smith Machinery,* the plaintiff alleged that the defendant, a manufacturer of farm machinery, had unlawfully tied the sale of its tractors to other farm machinery products. In affirming the district court's grant of summary judgment for the defendant, the court noted that line forcing is a vertical non-price restraint. *Id.* 878 F.2d at 1295. A vertical non-price restraint is "an agreement between entities at different levels of distribution that does not purport to affect prices or price levels charged for the goods." *Id.*

Relying on the Supreme Court's decision in *Business Electronics,* 485 U.S. 717, 108 S.Ct. 1515, which held that vertical non-price restraints are not *per se* illegal, the Tenth Circuit concluded that line forcing arrangements, because they are vertical non-price restraints, should likewise be exempt from *per se* treatment. *See id.* ("We concluded [in *Continental Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) ] that vertical nonprice restraints had not been shown to have such a 'pernicious effect on competition' and to be so 'lacking in redeeming value' as to justify per se illegality.").

Tying arrangements between manufacturers and dealers are also a form of vertical restraint and under certain circumstances should only be subject to rule of reason analysis. *See* Jean Wegman Burns, *The New Role of Coercion in Antitrust,* 60 Fordham

L.Rev. 379, 435 n. 3 (1991) ("Vertical restraints (in the form of vertical pricing, territory, and customer restrictions) and tying arrangements are both vertical restraints in the sense that both affect (and usually limit) the freedom of choice of a party on another level of the distribution chain."); *Jefferson Parish*, 466 U.S. at 35, n. 2, 104 S.Ct. at 1570, n. 2 (O'Connor, J. concurring) ("Exclusive contracts, that, like tie-ins, require the buyer to purchase a product from one seller, are subject only to the rule of reason."); *Business Electronics*, 485 U.S. at 717, 108 S.Ct. at 1516 ("Although vertical agreements on resale prices are illegal *per se*, extension of that treatment to other vertical restraints must be based on demonstrable economic effect rather than upon formalistic line-drawing.").[95]

In *Taylor*, the Fifth Circuit reversed the jury's finding of an unlawful tie and instead held in favor of the defendant manufacturer. 28 F.3d 1379. Hollymatic was a manufacturer of hamburger patty products and sold hamburger patty machines and paper products to its dealer (plaintiff). *Id.* at 1381. Hollymatic and Taylor had a contractual agreement that Taylor would use its "best efforts" to sell and service the full line of Hollymatic products. *Id.* Implicit in that agreement was that Taylor would not purchase patty paper from any of Hollymatic's competitors. *Id.* After selling only Hollymatic patty paper for several years, Taylor began to purchase a substitute. *Id.* Hollymatic confronted Taylor about its purchases from Hollymatic's competitors, and the parties attempted to forge a new agreement. *Id.* When they could not come to terms over the amount of patty paper that Taylor would be required to purchase each month, Hollymatic severed its relationship with Taylor. *Id.* Taylor then brought suit against Hollymatic alleging that it unlawfully tied the sale of hamburger patty machines to patty paper.

While assuming the presence of a tie, the *Taylor* court found that the tie between patty machines and paper did not violate the antitrust laws because it had no anticompetitive effect on the market. The court based its decision on the fact that the tie did not limit the ultimate choices available to consumers because customers purchasing patty machines from Taylor were free to purchase their patty paper elsewhere. *See Taylor*, 28 F.3d at 1383 ("Where, however, *only* dealers are subject to a tie, competitors do not lose a segment of the tied market if there are genuine alternative paths to consumers.") (emphasis in original). Relying on the cardinal antitrust principle that "the antitrust laws protect competition, not competitors," (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)), the *Taylor* court decided that the absence of any anticompetitive harm to the consumer prevented the court from allowing the jury verdict to stand. The court further explained that not all tying arrangements, or refusals to sell two products separately, necessarily restrain competition. *Taylor*, 28 F.3d at 1382 (citing *Jefferson Parish*, 466 U.S. at 11, 104 S.Ct. at 1558). Because the alleged tie in the *Taylor* case was also a vertical nonprice restraint, the court was further convinced that it should not be subject to *per se* analysis. *Id.* at 1383. The court reasoned that "there must be proof 'as a threshold matter of a substantial potential for impact on competition in order to justify *per se* condemnation.'" *Id.* at 1382 (quoting *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560).

The instant case involves a vertical restraint because Caterpillar and its dealers are "at different levels of distribution" and the alleged restraint has not resulted in Caterpillar charging significantly higher prices for its parts as is normally associated with

---

**95.** *See also Business Electronics*, 485 U.S. at 723, 108 S.Ct. at 1518–19 ("*[P]er se* rules are appropriate only for conduct that is manifestly anticompetitive"); *Lie*, 964 F.2d at 569 ("[A *per se* violation involves an] agreement[] whose nature and necessary effect [is] so plainly anticompetitive, no elaborate study of the industry is needed to establish its illegality"); *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679,

692, 98 S.Ct. 1355, 1365–66, 55 L.Ed.2d 637 (1978); *National Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103–104, 104 S.Ct. 2948, 2961–2962, 82 L.Ed.2d 70 (1984) ("*Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct.").

monopolist activity.[96] In *Business Electronics*, 485 U.S. at 735, 108 S.Ct. at 1525, the Court held that "[e]conomic analysis supports the view, and no precedent opposes it, that a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." Therefore, although the facts of this case amount to a hybrid between line-forcing and tying, they are most definitely characteristic of a vertical non-price restraint. Because vertical non-price restraints are generally not subject to *per se* analysis, the *per se* test should not be applied in this case.[97] *See Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 906 (6th Cir.1989) ("[vertical restraints] must be judged by the criteria of a 'rule of reason' analysis rather than the rubric of 'per se' illegality."); *Business Electronics*, 485 U.S. at 717, 108 S.Ct. at 1516–17 (vertical non-price restraints, such as exclusive territory agreements, are not illegal per se).

### iv. Effect on the Consumer

Most significant to the courts' decisions in *Smith Machinery* and *Taylor*, and extremely relevant to this case, is the courts' reliance on the fact that in most line-forcing situations, even those that involve exclusive-dealing arrangements like *Taylor*,[98] the ultimate consumer is not harmed by the arrangement. *See Taylor*, 28 F.3d at 1378–79 ("Such an arrangement [exclusive-dealing line-forcing/tie] is not the sort that would always or almost always tend to restrict competition and decrease output. It does not threaten competition to the same extent as tying arrangements that bind ultimate consumers."). Focusing on ultimate consumers is encouraged by the antitrust laws themselves. *See e.g., Smith Machinery*, 878 F.2d at 1296 ("The primary objective of the Sherman Act is to benefit consumers by promoting efficient and beneficial competition"); ("[We have always] considered alleged antitrust violations in light of their effect on consumers, not on competitors.") (citing *Westman Commission Company v. Hobart International, Inc.*, 796 F.2d 1216, 1220 (10th Cir.1986)). The Supreme Court has also focused on the alleged antitrust violation's effect on the consumer to determine whether an illegal tying arrangement exists. *See e.g., Jefferson Parish*, 466 U.S. at 18, 104 S.Ct. at 1561 ("[O]ur analysis of the tying issue must focus on the hospital's sale of services to its patients, rather than its contractual arrangements with the providers of anesthesiological services."). Because consumers are not hurt by vertical non-price restraints between manufacturers and dealers, the type of line-forcing/exclusive arrangement found in this case should not be subject to the same *per se* treatment as traditional tying arrangements.[99] It is true

---

**96.** Even if the prices have been increased to some degree, this fact only aids the plaintiff's competitive position with consumers. The higher the prices that Caterpillar charges for its parts, the more likely the consumer will shop elsewhere (i.e., look to Caterpillar's competitors).

**97.** The *Smith Machinery* scenario is not the typical vertical restraint because competitors can still sell their products to the dealer, while they arguably cannot in the instant case. *See Smith Machinery*, 878 F.2d at 1295 n. 5 ("In this particular case, the alleged line forcing might better be termed a vertical 'arrangement' rather than 'restraint' since Smith was not prohibited from carrying the product lines of competitors as it would be under an exclusive dealing arrangement, the classic 'vertical restraint.' "). Nevertheless, the Tenth Circuit's analysis is still relevant here, and its relevance is demonstrated by the applicability of the *Smith Machinery* analysis to the *Taylor* case which is very similar to this case. In *Taylor*, the dealer was prohibited from buying patty paper from Hollymatic's competitors like the dealers in this case; a typical vertical non-price restraint. Yet, despite that difference between *Smith Machinery* and

*Taylor*, *Taylor* was still decided on the same basis and consistent with the same principles as *Smith Machinery*. Therefore, the fact that this case is distinguishable from *Smith Machinery* in that *all* competitors were allegedly foreclosed from selling parts to Caterpillar dealers does not undermine the relevancy of the *Smith Machinery* analysis to this case.

**98.** *See Taylor*, 28 F.3d at 1384 ("It [the agreement between Taylor and Hollymatic] was in effect an exclusive-dealing agreement in which Hollymatic required Taylor to sell Hollymatic, and only Hollymatic, patty paper.").

**99.** This court is not convinced that even typical tying arrangements should be subject to *per se* analysis and would likely agree with Justice O'Connor's concurring opinion in *Jefferson Parish*. *See Jefferson Parish*, 466 U.S. at 34–35, 104 S.Ct. at 1569–1570 (O'Connor, J. concurring) (arguing in favor of abandoning *per se* test for tying arrangements and applying rule of reason analysis instead). However, the law in its current form retains quasi-*per se* treatment for some tying claims. *See id* at 18–19, 104 S.Ct. at 1561–1562.

that competitors such as Volpp may be harmed by line-forcing situations that limit their opportunities with particular outlets; however, the antitrust laws were "designed to protect competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

The consumers in this case still have significant *choice* as well as a guarantee of price competition in the replacement parts market, both of which the antitrust laws protect. The only negative consequence for a consumer of an exclusive line-forcing arrangement, like the one here, is the potential loss of convenience. It is true that the affected consumers in this case may not be able to purchase everything they want in the same place (i.e. machinery, service and parts). However, the *Taylor* court held that "[t]he fact that consumers *might* buy goods because of convenience created by a tie does not suffice as evidence of an unreasonable restraint on competition." *Taylor*, 28 F.3d at 1385. What the plaintiff in the instant case must demonstrate is that the tie "as it actually operated in the marketplace" harmed competition. *Breaux Brothers Farms, Inc. v. Teche Sugar Co., Inc.*, 21 F.3d 83, 86 (5th Cir.1994) (quoting *Jefferson Parish*, 466 U.S. at 31, 104 S.Ct. at 1568). Plaintiff has not produced such evidence.

Although consumers of Caterpillar machinery may not be able to buy non-genuine parts at Caterpillar dealerships, they may still purchase non-genuine parts on the open market. Volpp has alternative paths to consumers through its HEP marketing arm and its related chain of distribution. The HEP marketing arm sells its parts to repair shops, tractor parts operations, seal houses, OEM attachment manufacturers and to exporters. *See* Martin Tr. at 61–62, 75–76, 106–08; Request for Admission Nos. 242, 252, 253, 255, 294–305 and plaintiff's responses Ex. 91–93 (DX 180–82). Plaintiff can also still sell to other OEM dealers besides Caterpillar. *See supra* p. 1212. Further, although Plaintiff may have lost sales to Caterpillar dealers, their sales in other markets have continued to grow. Decl. of Larry Gray, p. 41, Ex. # 1.0 to Volpp's Response (Vol. 1). These facts demonstrate that the only exclusion that plaintiff has experienced as a result of the alleged tie is its "exclusion" from free-riding on defendant's own dealer distribution system.

The only drawback for Caterpillar consumers, with whom the antitrust laws are most concerned, is that they *may*[100] be prevented from purchasing a non-genuine part at a Caterpillar dealer. For Caterpillar equipment owners that prefer to have their equipment serviced at Caterpillar dealers and also prefer to use non-genuine parts, Caterpillar's line-forcing will likely cause inconvenience. However, the antitrust laws were not designed to protect convenience, but were enacted to safeguard competition. Caterpillar equipment owners can service their equipment at places other than Caterpillar dealerships where non-genuine parts are stocked and sold. There is no guarantee implicit in the antitrust laws that manufacturers will always have unrestricted access to any and all outlets through which they desire to sell their products. This is particularly true where a competitor, such as Caterpillar, has exerted tremendous effort to set up a dealer distribution chain for its own products. Plaintiff has no federally protected right to access the Caterpillar dealership market— there is no free-rider guarantee in the antitrust laws. Accordingly, plaintiff has failed to produce evidence that the alleged tie in this case, as it actually operated in the market, harmed competition or created a substantial potential for impacting competition negatively. Therefore, in paying heed to the venerable principles of antitrust law, the court finds that *per se* analysis is inappropri-

---

**100.** Caterpillar dealers have not completely stopped purchasing non-genuine parts. Many dealers still use such parts in emergency situations and others still use them on occasion. *See e.g.*, Blake Quinn Aff. (Dealer principal of Quinn Co., a California Caterpillar dealership) (noting dealership's policy of using non-genuine parts on occasion if the part is unavailable from Caterpillar, if a customer requests a non-genuine part on a particular job, or due to price considerations). It is notable that Volpp has not been completely cut out of the Caterpillar dealership "mini-market," and Caterpillar has never terminated a dealership for stocking non-genuine parts.

ate here and will accordingly review this case under rule of reason principles.

### v. *Rule of Reason Analysis*

■ The "rule of reason" approach requires that the party challenging the alleged unlawful tie set forth the tying arrangement itself and that the arrangement is "an unreasonable restraint on competition." *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982); *Beard v. Parkview Hosp.*, 912 F.2d 138, 140 (6th Cir.1990). As the Supreme Court held in *Nat'l Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978), "the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *See also Taylor*, 28 F.3d at 1386 ("To establish an unreasonable restraint of trade, Taylor's proof must have included evidence from which the jury could have found that Hollymatic's actions had a substantially adverse impact on competition.") (citations omitted). Volpp bears the burden of demonstrating that Caterpillar's actions had such an "actual adverse effect on competition."

■ "Assessing such an impact requires an inquiry into the conditions of the relevant market." *Smith Machinery*, 878 F.2d at 1296. Under certain circumstances, tying arrangements may actually promote competition. *See* IX Phillip E. Areeda, *Antitrust Law* P 1703g, at 50 (1991) ("suggesting that [t]ying sometimes benefits society by protecting quality, lowering costs or increasing value, increasing price competition, aiding entry, or rewarding a valuable patent."). Thus, "to the extent that a manufacturer's distribution practices enhance competition in the consumer market, they should be encouraged despite their effect on suppliers in an intermediate distribution market." *Smith Machinery*, 878 F.2d at 1296.

■ Even considering the facts in the light most favorable to the non-moving party, Volpp has not set forth any evidence that competition in the marketplace for replacement parts has been suppressed or is likely to be suppressed. Rather, the evidence in the record suggests that Caterpillar's aggressive promotion of its own products may have actually stimulated competition and resulted in Caterpillar becoming more price and service conscious when urging their products on their own dealers. *See e.g., supra* p. 1215 and n. 26 ("Districts should advise dealers that Caterpillar is committed to providing competitive prices which generate a reasonable (aggregate) return to the dealer"); *supra* p. 1220 and n. 63 (Caterpillar and Mustang reaching an agreement whereby Mustang was to disengage from sourcing alternative parts by a certain date *in exchange for* Caterpillar's assistance on hydraulic and turbocharger repair option development). For Volpp to prevail under the facts and circumstances of this case, "it would have to show that [Caterpillar's] line requirement so restricted the marketing of Volpp products that it impeded competition in the consumer market." *Smith Machinery* at 1296. As has already been discussed in the preceding section, the consumer is not hurt by Caterpillar's alleged actions in this case. Accordingly, under the rule of reason analysis, plaintiff's claim must fail.

### vi. *Per Se Analysis*

As set forth above, the court believes that a rule of reason analysis is most appropriate in the instant case. However, even if the court were to apply the *per se* test, plaintiff's claim would still fail.

■ To set forth a *per se* violation, a plaintiff must show that:

1) There is a tying arrangement between two distinct products or services;

2) The seller has sufficient economic power in the tying market to restrain appreciably competition in the tied product market; and

3) The amount of commerce affected is not insubstantial.

*Virtual Maintenance v. Prime Computer, Inc.*, 11 F.3d 660, 664, n. 6 (6th Cir.1993) (citations and internal quotations omitted), *cert. dismissed sub nom. Virtual Maintenance v. Computervision Corp.*, — U.S. —, 114 S.Ct. 2700, 129 L.Ed.2d 829 (1994). Establishing a tying claim where the plaintiff

has concrete proof of a tie, such as a contract that has been reduced to writing, is fairly simple. *See Bell v. Cherokee Aviation Corp.,* 660 F.2d 1123, 1126 (6th Cir.1981). However, in the absence of such an express tying arrangement, a plaintiff can also demonstrate that an unlawful tie exists by showing that a seller *forced* the tied product on an unwilling buyer. *Jefferson Parish,* 466 U.S. at 15, 104 S.Ct. at 1559–60; *Breaux Brothers,* 21 F.3d at 86; *Unijax, Inc. v. Champion Int'l, Inc.,* 683 F.2d 678, 685 (2d Cir.1982) ("Actual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation"); *Ogden Food Serv. v. Mitchell,* 614 F.2d 1001, 1002 (5th Cir.1980) (coercion is an element of an illegal tie-in); *but see Cherokee Aviation Corp.,* 660 F.2d 1123 (coercion is not an element of an illegal tie-in). Here, no express agreement exists.[101] Therefore, to prove a tying claim plaintiff must rely on evidence of coercion.

In the post-*Jefferson Parish* era, the modern *per se* rule abandons the former strict *per se* treatment in favor of a modified approach.[102] This quasi *per se* test is really "a hybrid between *per se* and rule of reason analysis because of the threshold examination of market power." Timothy S. Cragin, *Antitrust and Trade Regulation Law,* 42 La.B.J. 386, 387 (1994); Lazaroff, *Reflections of Eastman Kodak* at 115 ("[The *Jefferson Parish* Court] endorsed a method of analysis that does not entail all the elements of a full-blown rule of reason approach, but also does

not label a tie-in illegal without some threshold demonstration of market power in the tying product."). Pure *per se* treatment would automatically invalidate a tying arrangement without inquiring into market power. However, quasi *per se* condemnation is only appropriate "if the existence of forcing is probable." *Id.*

■ Therefore, the presence of coercion is a critical factor in the determination of whether the particular circumstances of a case give rise to an illegal tying arrangement. *See Unijax,* 683 F.2d at 686 ("[A] finding of the actual exercise of economic muscle [is] an indispensable element for proving a tying violation."). As the Supreme Court held in *Jefferson Parish:*

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such *forcing* is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Jefferson Parish,* 466 U.S. at 12, 104 S.Ct. at 1558 (emphasis added). The burden of proving coercion rests with the plaintiff. *Ogden Food Serv.,* 614 F.2d at 1002; *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 377 (5th Cir.1977).

---

**101.** The Sales and Service Agreement between Caterpillar and its dealers contains no provision that expressly requires the purchase of replacement parts in order to also buy Caterpillar equipment. Plaintiff alleges, however, that the contract's mandate to "adequately promote the sale of Caterpillar products" and its provision that dealer affiliation with other organizations that are "substantial operator[s] of products" would adversely affect that obligation to promote Caterpillar products, amounts to the express conditioning necessary to set out a tying arrangement. Such strong language, although indicative of Caterpillar's serious commitment to regaining lost sales of replacement parts, is not an express tie. There is nothing in the language of the agreement that absolutely requires Caterpillar dealers to stock only genuine parts. For that reason, plaintiff cannot prove that an express tying agreement between Caterpillar and its dealers exists.

**102.** Commentators have recognized that *Jefferson Parish* limited the scope of the *per se* rule. *See e.g.,* Daniel E. Lazaroff, *Reflections of Eastman Kodak Co. v. Image Technical Services, Inc.: Continued Confusion Regarding Tying Arrangements and Antitrust Jurisprudence,* 69 Wash. L.Rev. 101, 114 (1994) ("The shift in the Supreme Court's general attitude regarding tying arrangements became strikingly evident in *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In *Hyde,* four justices concurred with a five justice majority and specifically called for a repudiation of any *per se* approach to tie-ins. These four justices were, in essence, calling for rule of reason treatment of tie-ins as just another non-price vertical restraint. Even the majority, which did not wish to repudiate the *per se* approach, severely limited its applicability.").

Even when the facts are considered in the light most favorable to the non-moving party, plaintiff cannot sustain its burden of demonstrating that, in the context of a distributor-dealer relationship, Caterpillar dealers were forced to purchase Caterpillar parts in violation of the antitrust laws.

■■■ In deciding these types of cases, courts must be wary of the difference between forcing that amounts to an illegal tie under the antitrust laws, and aggressive salesmanship that is encouraged by those same antitrust laws. As the Fifth Circuit noted in *Unijax:*

A manufacturer's use of "strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce [its] retailer to buy its full line of products" does not, however, amount to actual coercion.

683 F.2d at 685 (quoting *Bob Maxfield Inc. v. Am. Motors Corp.,* 637 F.2d 1033, 1037 (5th Cir.1981)); *see also Ungar v. Dunkin' Donuts of Am., Inc.,* 531 F.2d 1211, 1225 (3d Cir.1976) ("The purpose of the antitrust laws is to stimulate economic competition, the essence of which is the presence of many competing sellers; salesmanship—the art of persuasion and influence—is inherent in competition among sellers."). Here, defendant's representatives did use "strong persuasion" and hard-line tactics to lure dealers into sourcing almost exclusively genuine parts. However, as the *Unijax* court found (even though the manufacturers in that case actually terminated plaintiff's distribution outlets in two states), such cajolery is not the sort of coercion proscribed by the antitrust laws. *See also Marathon Oil,* 528 F.2d 395 (rejecting a tie-in claim even though defendant's sales representative told plaintiff that his lease might be cancelled unless he purchased more of defendant's products and plaintiff's lease was ultimately cancelled).

■■■ Plaintiff has set forth numerous examples of alleged coercion, all of which essentially highlight the aggressive direction that Caterpillar undertook in order to increase revenue from genuine parts sales. The majority of these examples are contained in the fact section of this order. *See supra* pp. 1211–1223. The court will analyze those typical instances of Caterpillar's general behavior.[103] When Caterpillar committed itself to the task of regaining the replacement part sales it had lost to non-genuine parts manufacturers, managers were instructed to "do all those things that we know will work to sell parts." *See supra* p. 1213. Such a company statement embodies the very principles that the antitrust laws were designed to protect—competitive initiative. Caterpillar recognized that non-genuine parts sales were increasing and cutting into genuine parts sales profits. It is antithetical to American corporate culture, grounded in capitalist principles, to expect Caterpillar to ignore a potential profit center and decline to aggressively compete.

One example of Caterpillar's alleged "forcing" is the Caterpillar "Worldwide Marketing Management Meeting" where it was determined that dealers who outsource would be personally contacted by district/region managers and reminded of their obligations to Caterpillar. *See supra* p. 1214 and n. 14. In that meeting, the various measures for dealing with those situations were outlined. Those measures were: suspension of parts returns, one hundred percent inspection of warranty parts, and a dealer requirement that all non-genuine parts be identified on customer invoices. *See supra* p. 1214. None of those responses amount to termination of a dealership or rise to the level of unlawful coercion within the context of a tying arrangement. Since its inception in 1925, Caterpillar has established itself as a leader in the heavy equipment machinery market, and as such is certainly entitled to ensure that it is not covering the cost for warranties on parts not manufactured by Caterpillar by paying for non-genuine parts on return. Non-genuine parts manufacturers, such as the plaintiff, do not have a right to free-ride on Caterpillar's distribution system. If Caterpillar did not attempt to safeguard its investment in its own distribution system and its warranty and return parts programs, it would be declining to aggressively compete.

**103.** The court will not discuss each individual act of alleged "coercion," but the typical instances reflect the type of conduct alleged and suffice to explain the court's conclusion.

This kind of monitoring should simply be expected in a dealer-distributor relationship and does not rise to the level of coercion necessary to establish a tying arrangement.

After this meeting, Caterpillar decided that local representatives would have a "Woodshed talk" with dealers "who are into nongenuine parts" and send out a "sourcing loyalty letter." *See supra* p. 1214 and n. 18. The sourcing loyalty letter provided in relevant part:

> The basis of our agreements with dealers is our expectation that they will adequately represent the Caterpillar products designated in those agreements to our satisfaction. The use of genuine Caterpillar parts is essential to the performance of our dealers' obligation to support Caterpillar prime products and the fulfillment of their obligation to adequately represent the entire Caterpillar product line—including parts.

*See supra* p. 1214 and n. 19. This letter does not contain unlawful coercion when viewed within the context of a distributor-dealer relationship. Caterpillar may be attempting to use its influence to cajole its dealers into sourcing almost exclusively from Caterpillar—but such conduct does not rise to the level of the forcing required for a tying claim. Further, Caterpillar has submitted proof that the author of this sourcing letter believes that dealers "certainly ... have no contractual obligations to source entirely genuine Caterpillar parts." Confidential Testimony of David Lewis, Ex. # 84 to Caterpillar's Motion (Vol. III).

As a follow-up to the loyalty sourcing letter, Caterpillar also suggested that district managers respond to dealers who sell non-genuine parts with the following statement:

> [Y]ou can buy from whomever you choose—we have no control over that. But, I would ask you a similar question. Why shouldn't we sell tractors or parts to your competitor—perhaps the local Komatsu dealer? They may be happy to buy many items from us at good prices—our sales and profits could increase.

*See supra* p. 1215 and n. 22. The very first statement of the response, "you can buy from whomever you choose," clearly indicates that Caterpillar understood that it could not implement a strict requirement that dealers only stock genuine parts. However, there is a distinction between an absolute requirement and the sort of procompetitive focused persuasion found here.

A second dealer-sourcing letter, designed to assist district managers in their understanding of the parts issue, was sent as a follow-up to "suggested responses" such as the one quoted above. This letter strongly discouraged sourcing non-genuine parts by calling such conduct "unacceptable." Most significantly, however, the letter also contained a position statement that included the following declaration:

> Districts should advise dealers that Caterpillar is committed to providing competitive prices which generate a reasonable (aggregate) return to the dealer. We realize (and so do most dealers) that there will be situations where an individual transaction may not provide this return. Nevertheless, we expect dealers to pursue the total opportunity.

*See supra* p. 1215 and n. 26. This statement demonstrates that Caterpillar recognized it must compete and potentially lower its prices in order to guarantee sourcing loyalty from its dealers. It is true that Caterpillar may be able to leverage its influence as a distributor to more successfully persuade its dealers to source only genuine parts; however, such power is inherent in a distributor-dealer relationship and does not constitute unlawful forcing when considered in that context.

Other materials comprised within Caterpillar's campaign to sway its dealers to return to purchasing more genuine parts include a "district action letter" and a summary of a "successful attempt at encouraging one dealer to source only genuine CAT parts." The district action letter provides in relevant part:

> Under our dealership agreement, you have an obligation to adequately represent Caterpillar products including parts. Representation of directly competitive parts adversely affects that obligation. If you choose to stock non-genuine parts, we expect it to be only as an accommodation to customers who insist upon purchasing such

parts. We would expect you to not promote such products where we provide genuine Caterpillar parts.

*See supra* p. 1216 and n. 30. This statement indicates that Caterpillar recognizes that dealers will continue to stock non-genuine parts; however, Caterpillar's position as a distributor gives it some "extra muscle" to promote its best interests. Nevertheless, such muscle is a probable consequence of its relationship with its dealers and should be expected within that economic mini-system. Further, the summary of the successful attempt at encouraging one dealer to source only genuine Caterpillar parts indicates, by definition, that there are "unsuccessful attempts" and that Caterpillar does not assume it has the power to force dealers to obey its requests under any and all circumstances.

At a Caterpillar dealer meeting a Caterpillar representative explained Caterpillar's disapproval of the selling of non-genuine parts by stating that:

> I can think of nothing more injurious to our mutual long-term future than assisting competitive parts manufacturers to gain a stronger market position through our own distribution organization.

*See supra* p. 1217 and n. 38. As mentioned previously, Caterpillar is right to be concerned about the network it has painstakingly constructed over the years to profitably market its own products, and in a competitive system it should be protective of its own goodwill. Therefore, even strong measures to ensure that its own distribution system inures to the benefit of Caterpillar machinery and products, and not Caterpillar's and its dealers' competitors, are not coercive. Such measures are sound and expected competition.[104]

The contract between the individual dealers in this case and Caterpillar calls for the dealers to represent Caterpillar's full line, in return for which the dealers get an exclusive territory to sell Caterpillar products. By granting its dealers exclusive territories, Caterpillar essentially selected one individual dealer in each area to whom it could look to promote its sales in that area. If any individual dealer did not live up to its agreement, then Caterpillar would not make any sales in that "exclusive territory." And if Caterpillar did not make any sales in its territory, competition would diminish because then only the plaintiff would have an outlet to sell its products in that area. Therefore, Caterpillar's aggressive promotion of its genuine parts, which may have risen to the level of extreme persistence and cajolery, do not, in the context of the relationships between the parties in this case, rise to the level of coercion necessary to satisfy a tying arrangement. Accordingly, plaintiff has failed to submit sufficient evidence for a reasonable jury to return a verdict in Volpp's favor on its *per se* tying claim.

If plaintiff cannot establish a *per se* tying arrangement, then plaintiff bears the burden of showing that the alleged illegal conduct "unreasonably restrained competition." *See Jefferson Parish*, 466 U.S. at 29, 104 S.Ct. at 1567 ("In order to prevail in the absence of *per se* liability, respondent has the burden of proving that the Roux contract [alleged tie] violated the Sherman Act because it restrained competition."). The court has already applied the rule of reason analysis to the facts of this case and explained why the alleged antitrust violation in this case does not unreasonably restrain competition. *See supra* pp. 1230–1232.

### vii. Conclusion: Tying Arrangement Claim

The court concludes that even if it were to accept *all* of plaintiff's allegations as true, the antitrust claim asserted simply makes no economic sense. *See Eastman Kodak*, 504 U.S. at 468, 112 S.Ct. at 2083 (Finding that if plaintiff's theory is "economically senseless" no reasonable jury could find in its favor and summary judgment should be granted). Aggressive salesmanship is protected and encouraged by the antitrust laws and therefore cannot, in the context of distributors who award exclusive territories to dealers, form

**104.** The court notes that plaintiff has not provided any testimony from the more than 70 dealer principals that plaintiff claims were coerced. Instead, plaintiff focused its discovery on low-level employees in dealer parts departments even though plaintiff's expert conceded the relevance of dealer testimony on the issue of coercion. Kyler Tr. 463, Ex. 89.

the coercion necessary to prove a tie-in claim. To trigger federal protection under the antitrust laws, a violation must have an actual anticompetitive effect—it must hinder the machinations of the free market system. *See Jefferson Parish,* 466 U.S. at 31, 104 S.Ct. at 1568 ("Without a showing of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws, and no such showing has been made."). Nothing in this case has such an impact on the market, particularly the consumer for whom the antitrust laws were created. Therefore, even considering all the facts in the light most favorable to plaintiff, Volpp's claim must fail because it has not set forth any evidence of a tying claim that has an adverse effect on the consumer marketplace (rule of reason analysis). Nor has it established the presence of coercion necessary to justify *per se* treatment on a tying claim (*per se* analysis). Accordingly, and for the reasons discussed above, the court grants defendant's motion for summary judgment on the tying claim and on the issue of coercion.[105]

### (b) Volpp's Conspiracy Claim (Count II)

Caterpillar claims that it is entitled to judgment as a matter of law on Volpp's conspiracy claim (Count II) because it merely duplicates the tie-in claim (Count I) and also because there is no evidence of a conspiracy. Because Caterpillar is entitled to judgment as a matter of law on the tie-in claim, its argument for summary judgment on the conspiracy claim is well taken. Without an underlying unlawful tie or antitrust violation, there is no illegal conduct on which to base a conspiracy. Therefore, the court grants summary judgment on plaintiff's conspiracy claim.

### 3. *Volpp's State Antitrust Claim (Count III)*

In Count III of its amended complaint, Volpp has alleged state antitrust violations under *Tenn.Code Ann.* § 47–25–101 [106] and seeks compensatory and punitive damages as well as injunctive relief. Caterpillar contends, *inter alia,* that the damages section of the statute, § 47–25–106,[107] provides only a consumer remedy and that no remedy at all is available to a competitor such as Volpp.

Caterpillar notes that the exclusive remedy of the statute is that the person injured "may sue for and recover ... the full consideration or sum paid by him" for any goods sold in violation of the statute. As a competitor, Volpp never paid any consideration or sum for any product sold in violation of the statute. Caterpillar argues that as a consequence, Volpp may recover nothing. At oral argument, Volpp conceded that a competitor such as itself has no remedy under the Tennessee antitrust statute. The court agrees. Viewing all evidence in the light most favorable to Volpp, Caterpillar is entitled to judgment as a matter of law on Count III. The court will accordingly grant Caterpillar's motion for summary judgment on Count III.

### 4. *Volpp's Claim for Intentional Interference with Prospective Business Relations (Count IV)*

Count IV of Volpp's complaint alleges that Caterpillar "intentional[ly] interfere[d] with

---

**105.** Because the court has already held that no unlawful tying arrangement exists in this case, it need not reach the antitrust injury or damages issues.

**106.** *Tenn.Code Ann.* § 47–25–101 provides as follows: All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend to advance, reduce, or control the price or the cost to the

producer or the consumer of any such product or article, are declared to be against public policy, unlawful and void.

**107.** *Tenn.Code Ann.* § 47–25–106 provides as follows:

Any person who is injured or damaged by any such arrangement, contract agreement, trust, or combination, described in this part may sue for and recover, in any court of competent jurisdiction, of any person operating such trust or combination, the full consideration or sum paid by him for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.

[plaintiff's] on-going and prospective business relations with authorized Caterpillar dealers." Amended Compl. at ¶ 21. On its face, Count IV appears to be a claim for interference with an existing contractual relationship as well as an action for interference with prospective business relations.

Caterpillar contends that it is entitled to judgment as a matter of law on this claim because: (1) Volpp has failed to establish certain elements of the tort of interference with on-going business relations, and (2) Tennessee law does not recognize the tort of interference with prospective business relations. Specifically, as to the claim for interference with on-going business relations, Caterpillar cites cases applying Tennessee law to argue: (1) that Caterpillar cannot be held liable for interfering with Volpp's at-will business relationship with Caterpillar dealers; (2) that there is no evidence that Caterpillar was motivated by malice; and (3) that there is no evidence to show that but for Caterpillar's actions, Volpp would have entered into a business relationship with any Caterpillar dealer. As to the claim for interference with prospective business relations, Caterpillar argues Tennessee law does not recognize the tort and that the claim should accordingly be dismissed.

An assumption underlying Caterpillar's arguments is that Tennessee law should be applied to Count IV. This assumption is stated explicitly with respect to Caterpillar's argument on the claim for interference with *prospective* business relations. Caterpillar argues that Tennessee law applies to that claim, relying on the old choice of law principle of *lex loci delicti. See* Restatement of Conflict of Laws § 377 (1934) ("First Restatement"); *see also Winters v. Maxey*, 481 S.W.2d 755 (Tenn.1972), *overruled by Hataway v. McKinley*, 830 S.W.2d 53 (Tenn.1992). Caterpillar makes no choice of law argument on the claim for interference with on-going business relations but relies on cases applying Tennessee law in arguing that it is entitled to judgment as a matter of law on that claim.

When a federal court is called upon to apply state substantive law to a claim, the conflicts law of the forum determines which state's law to apply. *Telecommunications, Eng'g Sales & Serv. Co. v. Southern Tel. Supply Co.*, 518 F.2d 392, 394 (6th Cir.1975). Caterpillar is thus correct in looking to choice of law principles of Tennessee to determine the applicable substantive law. However, after the briefs on the instant motion were filed, the Tennessee Supreme Court rendered its decision in *Hataway v. McKinley*, 830 S.W.2d 53 (Tenn.1992). In *Hataway*, the court abandoned the lex loci delecti choice of law doctrine embodied within the First Restatement, adopting instead the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws ("Second Restatement"). 830 S.W.2d at 57, 59. Under this approach, "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation." The court adopted the following provision of the Second Restatement:

§ 145. The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state, which with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Hataway*, 830 S.W.2d at 59. The Tennessee Supreme Court also adopted Section 6 of the Second Restatement, referenced in Section 145 (quoted above), as follows:

§ 6. Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability, and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.*

■■■■ Caterpillar has not addressed the prevailing choice of law principles in Tennessee and therefore at this point has failed to show that Tennessee substantive law applies to Volpp's claim(s) for either on-going or prospective business relations. In the absence of such a showing, Caterpillar's attempt to demonstrate that it is entitled to judgment as a matter of Tennessee substantive law on Count IV must fail. The court will accordingly deny Caterpillar's motion for summary judgment on Count IV.[108]

## CONCLUSION

Caterpillar's motion for summary judgment on all of Volpp's federal claims is grant-

ed and accordingly the federal claims are dismissed with prejudice. The court also grants Caterpillar's motion for summary judgment on Volpp's state antitrust claim. The court denies Caterpillar's motion for summary judgment on Volpp's state claim for intentional interference with prospective economic advantage.

IT IS SO ORDERED.

---

**108.** The court further notes that even if Tennessee law applied, plaintiff's claim for intentional interference with prospective economic advantage would fail because that tort has never been recognized by the Tennessee courts. *See Chilton Air Cooled Engines, Inc. v. Omark Indus., Inc.,* 721 F.Supp. 151, 156 (M.D.Tenn.1988) (finding that Tennessee has not developed any case law concerning interference with prospective business relations). Although the Tennessee courts have never expressly rejected such a cause of action, *Quality Auto Parts v. Bluff City Buick,* 876 S.W.2d 818, 823–24 (Tenn.1994) ("We conclude that the question of whether Tennessee law rec-

ognizes the tort of intentional interference with prospective economic advantage should be postponed to another day"), this court declined to create a cause of action for interference with economic advantage in *Valley Prods. Co., Inc. v. Landmark,* 877 F.Supp. 1087 (W.D.Tenn.1994). Because such a claim does not presently exist under Tennessee law, this court would once again decline to create a cause of action that has never before been recognized. *See Chilton Air,* 721 F.Supp. at 156 (dismissing claim because "Tennessee has not recognized tort of interference with prospective business relations.").